Filed 1/5/16  In re S.Q. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.Q., a Person Coming Under the Juvenile Court Law. | B263785 (Los Angeles County Super. Ct. No. CK99726) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KATE C., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Julie Fox Blackshaw, Judge.  Affirmed.

Law Offices of Vincent W. Davis & Associates and Stephanie M. Davis for Defendant and Appellant.

Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

_____

Kate C. (mother) appeals from a juvenile court order terminating her parental rights (Welf. & Inst. Code, § 366.26)[1] to her daughter, S.Q. (S., born Mar. 2012). She contends that the juvenile court violated her due process rights by denying her a contested hearing.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Prior Appeal*

As set forth in our prior opinion, in May 2013, the Department of Children and Family Services (DCFS) filed a section 300 petition on behalf of S. (*In re S.Q.* (Sept. 9, 2014, B251773) [nonpub. opn.], at p. 3.) The juvenile court sustained the allegations against mother, removed S. from mother's custody, granted mother reunification services, and granted mother monitored visits as well as a two-hour weekly unmonitored visit with S. (*In re S.Q.*, *supra*, B251773, at p. 17.) S. was placed with her paternal grandparents, who were her legal guardians from June 2012 through April 2013 (*In re S.Q.*, *supra*, B251773, at pp. 2–3) and with whom she had been placed (and remained placed) since May 2013 (*In re S.Q.*, *supra*, B251773, at p. 9).

*Interim Review Report (Dec. 18, 2013)*

During the reunification period, the social worker reported that he provided mother with referrals for her court-ordered family reunification services, including parenting education, a domestic violence support group, mental health counseling, a 12-step program, and random drug testing. Mother provided the social worker with written documentation regarding her prescription medications, which included Adderall, Diazepam, Bupropion, and Microgestin.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

<u>Compliance with court-ordered services</u>

The social worker spoke with mother's therapist, who voiced concerns over mother's missed therapy appointments.

Mother provided the social worker with a certificate of completion for a domestic violence program through Logan Group, but Logan Group was an online program and not part of the referral list that the social worker had provided to mother.

Mother also provided the social worker with a certificate of completion of a four-hour parenting program from the DAZ Foundation; DCFS recommended that she complete additional parenting classes.

Mother tested positive for amphetamine and methamphetamine on November 7, 2013; the positive amphetamine result would confirm that mother was taking her Adderall prescription. On November 15, 2013, mother complained that the social worker had not provided her with referrals and she was having difficulty obtaining her random drug testing. The November 22, 2013, drug test result indicated that mother had failed to provide a specimen. The social worker discovered that mother had used two different names (her last name as well as the maternal grandmother's last name) at the drug-testing site.

On December 9, 2013, mother informed the social worker that she was enrolled in individual counseling with the DAZ Foundation and that she had attended three sessions.

Mother was not attending a 12-step program.

<u>Visitation</u>

Beginning September 2013, DCFS provided mother with unmonitored visits on Wednesdays, Saturdays, and Sundays for three hours each. The exchange occurred at the Los Angeles Police Department. Visits were proceeding as scheduled.

DCFS attempted to modify mother's visits on November 23, 2013. They offered mother an additional three-hour visit on Tuesday so that the paternal grandparents, with whom S. had been staying, could take her to San Diego for the Thanksgiving holiday weekend. Mother would have S. for six hours on Christmas Eve and the paternal

3

grandparents would have her on Christmas Day. However, the paternal grandmother informed the social worker that mother had forgotten about the plan.

*DCFS Ex Parte Application; Juvenile Court Order*

On December 20, 2013, DCFS filed an ex parte application requesting that mother's visits be restricted to monitored. DCFS argued that mother had been inconsistent with her random drug testing and participation in individual counseling; mother had taken an unapproved online domestic violence program; and mother had neglected to participate in a 12-step program.

The juvenile court granted the application and ordered mother's visits to be monitored by a DCFS-approved monitor. It ordered DCFS to consider Michael C. (Michael)[2] as a possible visitation monitor. It also gave DCFS the discretion to liberalize mother's visits after she tested negative for 10 consecutive random or on-demand drug tests.

*Request for Walk-on*

On January 4, 2014, mother filed a request for walk-on, claiming that the juvenile court had failed to set up a visitation schedule in over three weeks. She also requested that Michael be allowed to monitor her visits with S.

About two weeks later, the juvenile court ordered DCFS to provide mother with a written monitored visitation schedule.

*Last Minute Information for the Court (Mar. 20, 2014)*

DCFS reported that mother had had weekly monitored visits with S. on Mondays for an hour-and-a-half.

On March 3, 2014, mother asked the social worker if her monitored visits could be liberalized. Specifically, she asked if Michael could monitor her visits. The social worker asked mother to have Michael go to the DCFS office to sign the monitor's instructions and visitor's terms forms. However, the social worker was concerned about

---

[2] Michael is mother's former foster father (when she was a child). (*In re S.Q.*, *supra*, B251773, at p. 3.) Mother has resided with him from time-to-time. (*Ibid*.)

4

Michael monitoring the visits because she lived with him. As of March 20, 2014, Michael had not yet contacted the social worker.

On December 4, 2013, mother was arrested for prostitution while she was living with Michael. Thus, DCFS could not approve Michael as a monitor at that time.

Mother tested negative for drugs four times between January and March 2014.

*Status Review Report (May 7, 2014)*

Visitation

Mother visited with S. every Monday at the DCFS office. S. appeared to be friendly to mother and offered her hugs and kisses during the visits. S. presented as a calm and quiet child. She transitioned well before and after visits.

Mother's visits were consistent; she had not missed any. The monitor reported that the visits were going well and mother would bring food and toys. During visits, mother would read books to S. and they played with toys.

Mother requested that the visits be liberalized; the visits were modified so that they would take place in the downstairs lobby of the DCFS building.

Compliance with court-ordered services

Mother was not compliant with her court-ordered services. On March 24, 2014, the social worker tried to offer mother additional referrals, but mother refused. She said that she was seeing a therapist, but she could not provide any contact information. The social worker asked mother to sign a release of information form with her therapist.

There was some confusion with mother's random-drug testing. If mother was taking her prescribed medication, she would test positive for amphetamine.

She told the social worker that she was a loving mother who never caused any harm to S. She claimed that the positive test result for methamphetamine was the result of a mistake by the testing lab.

S.Q.

Meanwhile, S. appeared relaxed in her paternal grandparents' home. While there were no medical concerns, there were concerns about her speech and language development.

According to Dr. Kelly Glaze, the paternal grandmother noted that S. engaged in aggressive or self-injurious behavior when frustrated. Further, after visits with mother, the paternal grandmother reported that S. would have "sleep disturbances . . . , defiant behavior . . . , and aggression." Dr. Glaze noted that S. and the paternal grandmother had been participating in psychotherapy as a result of S.'s current symptoms of aggressive and defiant behaviors and her exposure to domestic violence.

*Status Review Report (July 16, 2014)*

The paternal grandmother informed the social worker that S. transitioned well before and after visits with mother.

Mother consistently visited S. Her visits had been modified to allow mother to visit at the museum across the street from the DCFS office.

The social worker was unable to reach mother to discuss her progress in court-ordered services. She missed her drug test on April 17, 2014.

Dr. Glaze reported that S. appeared to be improving and felt less anxiety when she was separated from the paternal grandmother during her visits with mother. Her language skills were improving, which helped alleviate some frustration when she was trying to communicate her needs.

S. was very bonded to the paternal grandparents. She was also very attached to her parents.

*Last Minute Information for the Court (Sept. 29, 2014)*

The social worker met with mother regarding Michael being a potential monitor for her visits. Mother asked that the social worker not mention her arrest for prostitution because he did not know about it.

Mother indicated that she was prescribed Adderall, which she took twice a day; she also took Wellbutrin daily and Diazepam every other day as needed. When asked

6

why mother had not tested positive for her prescribed medications, mother explained that she knew she was going to test so she did not take them. The social worker reminded mother that the juvenile court had ordered her to take all of her prescribed medications; mother did not reply. When asked why mother had missed multiple drug tests in July, August, and September, mother stated, "'It was a busy day and I shirked my responsibility.'" Mother tested negative for drugs on September 12, 2014.

Mother's therapist, Stephanie Castro, reported that mother had been regularly attending her weekly therapy sessions for the past one-and-one-half months. She said that mother was making progress toward her goals.

The social worker had called Michael twice requesting that he call back about becoming a visitation monitor for mother. Michael had not returned the calls.

*Status Review Report (Dec. 12, 2014)*

Mother was participating in her court-ordered case plan of random drug and alcohol testing, domestic violence classes, parenting education, individual counseling, and mental health treatment.

On October 24, 2012, Ms. Castro reported that up until two months ago, mother's therapy attendance had been inconsistent and scattered; she was at risk of being dropped from the program. However, mother now appeared interested in reunifying with S.

Mother had missed at least one drug test, but had also tested negative at a test scheduled for the following week. The social worker noted that mother had a poor drug testing history and no real or valid excuse for missing tests.

Mother provided a letter from the Sojourn agency, indicating that she had attended three group sessions of a domestic violence program in 2013.

Mother's mental health issues were being treated.

Mother provided the social worker with attendance sheets from AA/NA meetings she attended from September 2013 through September 2014; she attended meetings approximately once a week. The social worker was unable to confirm whether she had a sponsor.

7

Mother continued to have weekly monitored visits with S. at the DCFS office. The social worker discussed with mother about providing candidates for others to become DCFS-approved monitors; the social worker suggested mother's boyfriend. Mother initially declined because she did not want to get him involved. However, on November 6, 2014, mother stated that she was interested in having her boyfriend monitor her visits with S.

Regarding visitation, the monitor stated: "'I would say that things go okay for the most part, but I do have some concerns with the mother. She is not very receptive or re-directable with the child. The child is old enough to walk, but the mom carries her on her hip—literally everywhere all the time. This is odd and I have asked her to let the child walk instead of carrying [S.] on her hip. She is too big for that and it is a little strange. Also, a few months ago . . . the mom came to a visit glassy eyed and was high. She wasn't normal. I have been monitoring the mom for a year. I confronted the mom with this and the mother changed the subject and blew it off.'" (Italics omitted.)

The social worker explained that due to concerns regarding mother's missed drug tests, her abnormal behavior during visits, and possibly being under the influence of drugs during visits, DCFS had not liberalized mother's visits with S. to unmonitored.

The paternal grandparents were willing to adopt S. if the parents did not reunify.

Visitation Logs

On September 23, 2013, the social worker monitored a visit between mother and S. S. appeared comfortable with mother. Mother was very affectionate with S. and hugged and kissed her, telling her that she loved her. At the end of the visit, S. comfortably waved goodbye to mother and went to the paternal grandparents.

On October 18, 2013, the paternal grandmother reported that mother's visits with S. had been going relatively well. She noted that mother was nice to her during the visitation exchange.

On December 24, 2013, the social worker left mother a message, offering her a three-hour visit at a local park on December 25 and 27, 2013. The paternal grandmother agreed to monitor the visits. On December 25, 2013, mother called the social worker,

8

stating that she did not know about the visit for that day. Later that day, the paternal grandmother stated that mother did not show up for the visit. The paternal grandmother informed mother that there also was a visit scheduled for December 27, 2013; mother did not show up for that visit.

On December 31, 2013, the social worker offered mother a visit on New Year's Day at a local park with the paternal grandmother as the monitor. Mother said that she would not feel safe at the visit because she believed that father would be present.

Mother did not show up for the February 10, 2014, visit.

Mother showed up 10 minutes late for the February 24, 2014, visit. She greeted S. with hugs and S. showed mother her shoes. Mother picked up S. and held her tightly. She brought markers, a coloring pad, juice, and snacks. Mother fed S. and S. was content. Mother took pictures of her and S. Mother was affectionate and told S. that she missed her and was happy to be with her. Mother changed S.'s diaper. Mother gave S. snacks to take home. The visit went well and without incident.

Mother arrived on time for the March 10, 2014, visit. She brought toys, markers, coloring books, and snacks. She was affectionate with S., hugging her and holding her, and told her that she missed her. Mother fed S. and changed her diaper. At one point, S. became cranky and pointed to the door as if she wanted to leave. Mother responded: "'I know, I want to leave with you but it is the law.'" S. and mother played with mother's makeup. Again, the visit went well and mother was appropriate.

At the March 17, 2014, visit, mother brought a lot of toys and snacks for S.'s birthday. Mother hugged and held S. They played with toys. When S. whined, mother comforted her. Mother took pictures, and she took care of S. by feeding her and changing her diapers and clothes. Mother played a cartoon on her cellular telephone, which S. enjoyed. Again, the visit went well.

When the March 24, 2014, visit began and S. was being separated from the paternal grandmother, S. started to cry. Mother was able to redirect her and verbally console her. Mother brought snacks and fed S. She read her a book and they played.

9

The March 31, 2014, visit also went well, although at one point mother said, "'[S.] [is] in a ignoring bitter mood today'" and described S. as "'bitter.'"

On April 3, 2014, S.'s father called the dependency investigator, stating that on March 31, 2014, he received a call from mother, who was drunk. He added that mother told him that she had been arrested four times and that she was working with a "madam." She also sold prescription medication, including to an undercover police officer.

At the April 7, 2014, visit, the social worker asked mother about her arrest; she denied that she had been arrested. She refused to sign the form to have S. assessed by the Regional Center, claiming that if S. spent more time with her, then she would talk more. Mother did bring toys, cake, and sushi to the visit.

On April 14 and 21, 2014, S. was excited to see mother. Mother played cartoons on her cellular telephone for S.; she also changed her diaper and fed her. They played with toys and mother took pictures. Mother was affectionate and attentive.

The paternal grandmother reported on April 23, 2014, that mother's visits with S. were improving as S. did not cry when she was left with mother.

Although mother was five minutes late for the April 28, 2014, visit, and S. was cranky, the visit went well. Mother brought gifts and food for S. They played, and mother changed her clothes and diaper. Mother was patient, affectionate, and attentive.

*Last Minute Information for the Court (Dec. 12, 2014)*

Mother tested negative for drugs on November 18, 2014. Mother had completed 29 sessions with Ms. Castro, who reported that mother had been consistent with her treatment and had shown excellent progress.

*Contested Section 366.22 Hearing (Dec. 12 & 15, 2014)*

The juvenile court found mother not in compliance with her court-ordered case plan and terminated reunification services. Mother could still have visits for at least three hours a week. The matter was set for a section 366.26 hearing.

*Section 366.26 Report (Apr. 13, 2015)*

Mother had twice weekly visits for an hour-and-a-half each; mother's boyfriend was the approved monitor for the Thursday visits. The visits were usually uneventful.

10

On March 2, 2015, mother cancelled her visit with S. The paternal grandmother stated that mother had said that she was sick and unable to visit. However, S.'s father told the paternal grandmother that on March 1, 2015, mother had called him and sounded intoxicated. The paternal grandmother believed that mother cancelled the visit because she was "'hung over.'"

On March 30, 2015, the paternal grandmother informed the social worker that mother's boyfriend allowed mother's visits to occur at their home. The social worker noted that DCFS did not provide mother with visits at her home; visits were supposed to take place in a neutral setting. Moreover, mother's boyfriend had failed to inform DCFS about the plan for home visits. DCFS was concerned about mother's boyfriend's ability to remain a neutral visitation monitor.

The adoption home study for the paternal grandparents had been approved. S. had been in their home since May 2013; they loved her and wanted to provide for her and protect her.

DCFS recommended that the juvenile court terminate parental rights and that S. be adopted by the paternal grandparents.

*Section 366.26 Hearing*

Mother's counsel made an offer of proof as to the basis for setting the section 366.26 hearing for contest. He said: "Understanding that the only exception that I have in terms of—after looking at the record—is the [section] 366.26 [subdivision] (c)(1)(B)[(i)] exception in terms of the mother having consistent contact with the child and that it would be detrimental to terminate that relationship or sever that relationship—I understand, in talking with my client, that her visitation has been monitored, two times a week for one and a half hours. And I understand that, under the law and in the appellate cases at this point, normally, a parent should be at a point of having unmonitored overnight weekend visitation as kind of a minimum bar. [¶] But I would offer that my client has, apparently, made numerous requests of the social worker to try and liberalize this visitation, and there doesn't seem—in speaking with her—to have been any definitive reason given to her as to why the visits cannot be liberalized at some point.

11

And I'm not sure why a [section] 388 [petition] wasn't filed previously to address this issue earlier than at this point. [¶] So, unfortunately, I have to leave it up to the court in terms of where we are with visitation for the mother, but simply stress that I believe the mother has an extremely strong bond with this child, and I do have available her visitation monitor who would testify to that bond."

The juvenile court noted that case law required a parent to have a significant parenting role in a child's life, which was not possible with monitored visitation. Then, it denied mother a contested hearing. S.'s counsel joined in the juvenile court's decision.

The juvenile court found that S. was adoptable and that it was detrimental for her to be returned to parental custody. It terminated parental rights.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

Mother argues that the juvenile court violated her due process rights by denying her a contested hearing.

At the section 366.26 hearing, the juvenile court must make a permanent plan for the minor child. (§ 366.26, subd. (b).) The preferred permanent plan is adoption. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 164.) If the juvenile court finds a child to be adoptable, it must terminate parental rights absent specified circumstances in which it would be detrimental. (§ 366.26, subd. (c)(1).) "After the parent has failed to reunify and the court has found the child likely to be adopted, it is the parent's burden to show exceptional circumstances exist" to circumvent the termination of parental rights. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574; see also *In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1164.)

At the section 366.26 hearing, the juvenile court may require an offer of proof before allowing a contested hearing on the beneficial parental relationship exception to termination of parental rights. (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122.) Such an offer of proof serves to "clearly identify the contested issue(s) so [the court] can determine whether a parent's representation is sufficient to warrant a hearing involving

12

presentation of evidence and confrontation and cross-examination of witnesses." (*Ibid.*) Due process requires that a contested hearing be held only if the parent's offer of proof shows that the parent has "'relevant evidence of significant probative value to the issue before the court.'" (*Ibid.*) "A proper offer of proof gives the trial court an opportunity to determine if, in fact, there really is a contested issue of fact." (*Id.* at p. 1124.) "The offer of proof must be specific, setting forth the actual evidence to be produced, not merely the facts or issues to be addressed and argued." (*Ibid.*) Where a parent has not made a sufficient offer of proof, the denial of a contested hearing does not violate the parent's due process rights. (*Id.* at p. 1116.)

While mother had regular visitation with S., that visitation never progressed past monitored and only occurred twice a week. Under those circumstances, the juvenile court properly determined that mother failed to make an adequate offer of proof that she occupied a parental role. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1108; *In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1418–1419; *In re Casey D.* (1999) 70 Cal.App.4th 38, 51.)

Even if the juvenile court erred in failing to hold a contested hearing, sufficient evidence establishes that the outcome would have been the same—mother's parental rights would have been terminated. (Cal. Const., art. VI, § 13 [reversal only if error results in a miscarriage of justice].) Mother did not, and could not, establish that the parental benefit exception to termination of parental rights applied. (§ 366.26, subd. (c)(1)(B)(i); see, e.g., *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Again, although mother maintained regular and consistent visits with S., she failed to demonstrate that any benefit S. received would outweigh the benefit conferred by adoption. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1155–1156; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) From the time she was three months old until she was 17 months old, she lived with her paternal grandparents under a legal guardianship. (*In re S.Q.*, *supra*, B251773, at pp. 2–3.) One month after the legal guardianship was terminated and mother regained custody of S., S. was detained in the paternal grandparents' home, where she has remained. S. is bonded to her paternal grandparents and, while she has shown that she is

13

excited to see mother, there is no evidence that she is bonded to mother as her parent. Thus, mother did not, and could not, prove that termination of parental rights would have been detrimental to S. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1207.)

Mother contends that she was deprived of her right to visitation because DCFS did not liberalize her visits. Aside from the potential procedural obstacles to this argument, the appellate record does not support this claim. Early, mother asked that Michael monitor her visits, but Michael failed to contact the social worker about signing the requisite forms. After Michael failed to be responsive, the social worker suggested that mother's boyfriend monitor the visits; mother resisted this idea. Also, the visitation changed in location, from the DCFS office, to the building lobby, to the museum across the street and local parks. And the visits increased, from once a week to twice a week.

*In re Brandon C.* (1999) 71 Cal.App.4th 1530 does not compel reversal. Certainly, that case recognized that a court may consider the relationship between a parent and a child in the context of a dependency setting, e.g., the amount of visitation permitted and whether the parent was ever the child's primary caretaker. (*In re Brandon C.*, at pp. 1537–1538.) But, as set forth above, the overriding concern is whether the benefit gained by continuing the relationship between the biological parent and the child outweighs the benefit conferred by adoption. (*In re Lukas B.*, *supra*, 79 Cal.App.4th at pp. 1155–1156; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Mother has not shown that here.

**DISPOSITION**

The juvenile court's order is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
BOREN


_____, J.
CHAVEZ